# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x
JOHN OLAGUES,                  )

                                        )

                     Plaintiff,       )

                v.                )    No. 14-CV-4872 (GHW)

                                          )

JAMES DIMON and         )

JPMORGAN CHASE & CO.,      )

                                        )

                   Defendants.    )

--------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Sharon L. Nelles
Andrew J. Finn
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
nelless@sullcrom.com

*Attorneys for Defendants James Dimon and JPMorgan Chase & Co.*

November 10, 2014

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................2

    A.  The "Short-Swing" Profit Rule ..................................................................2

    B.  The 2002 Options Grant to Mr. Dimon and the
March 2012 Disposition of JPMC Shares That
Resulted in a Net Delivery to Mr. Dimon
of 52,833 JPMC Shares ............................................................................4

    C.  The 2010 and 2011 Restricted Stock Unit Awards
and the January 2013 Disposition of JPMC Shares
That Resulted in a Net Delivery to Mr. Dimon
of 101,911 JMPC Shares ..........................................................................6

    D.  Mr. Dimon's July 2012 Purchases of JPMC Common Stock ....................7

    E.  Plaintiff's "Demand" ................................................................................8

    F.  The Amended Complaint ..........................................................................9

STANDARD OF REVIEW ...................................................................................10

ARGUMENT .......................................................................................................11

I.  Plaintiff Has Not Pled That There Were Any Non-Exempt "Sales"
of JPMC Stock Subject to Section 16(b) ........................................................12

    A.  The March 2012 Disposition and the January 2013
Disposition Were Exempt Transactions Under Rule 16b-3(e)
Because They Were Authorized Dispositions to the Issuer.......................12

        1.    The March 2012 Disposition to JPMC To Pay the
Purchase Price and Tax Obligations When the
2002 Options Were Exercised Is Exempt Under
Rule 16b-3(e) Because It Was an Authorized
Disposition to the Issuer.................................................................14

        2.    The January 2013 Disposition to JPMC To Pay Tax
Obligations When the 2013 RSUs Vested Is Exempt
Under Rule 16b-3(e) Because It Was an Authorized
Disposition to the Issuer.................................................................14

    B.  The March 2012 Disposition and the January 2013 Disposition
Are Not "Sales" Under Section 16(b).......................................................15

II.  Plaintiff Lacks Standing to Bring This Lawsuit Because His
"Demand" to JPMC Was Inadequate ..............................................................17

CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abely* v. *Aeterna Zentaris Inc.*,
    2013 WL 2399869 (S.D.N.Y. May 29, 2013) ........................................................11

*Analytical Surveys, Inc.* v. *Tonga Partners, L.P.*,
    684 F.3d 36 (2d Cir. 2012) ........................................................................16

*At Home Corp.* v. *Cox Commc'ns, Inc.*,
    446 F.3d 403 (2d Cir. 2006)....................................................................15, 16

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007)................................................................................10

*Chechele* v. *Sperling*,
    758 F.3d 463 (2d Cir. 2014) ......................................................................16

*Donoghue* v. *Casual Male Retail Group, Inc.*,
    427 F. Supp. 2d 350 (S.D.N.Y. 2006)............................................................14

*Donoghue* v. *Patterson Companies, Inc.*,
    990 F. Supp. 2d 421 (S.D.N.Y. 2013)............................................................11

*Eaves* v. *Designs for Fin., Inc.*,
    785 F. Supp. 2d 229 (S.D.N.Y. 2011)............................................................10

*Foremost-McKesson, Inc.* v. *Provident Sec. Co.*,
    423 U.S. 232 (1976)................................................................................15

*Gibbons* v. *Malone*,
    703 F.3d 595 (2d Cir. 2013)......................................................................10

*Gryl ex rel. Shire Pharm. Grp. PLC* v. *Shire Pharm. Grp. PLC*,
    298 F.3d 136 (2d Cir. 2002) ......................................................................13

*Halebian* v. *Berv*,
    631 F. Supp. 2d 284 (S.D.N.Y. 2007) ..........................................................11

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) ..........................................................11

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*In re Facebook, Inc., IPO Sec. & Derivative Litig.,*
    986 F. Supp. 2d 544 (S.D.N.Y. 2014) ....................................................................11

*Kaster* v. *Modification Sys., Inc.,*
    731 F.2d 1014 (2d Cir. 1984) .................................................................................19

*Kern Cnty. Land Co.* v. *Occidental Petroleum Corp.,*
    411 U.S. 582 (1973)..............................................................................................15

*Klein ex rel. SICOR, Inc.* v. *Salvi,*
    2004 WL 596109 (S.D.N.Y. Mar. 30, 2004) .........................................................19

*Levner* v. *Saud,*
    903 F. Supp. 452 (S.D.N.Y. 1994).........................................................................19

*Levy* v. *Sterling Holding Co., LLC,*
    544 F.3d 493 (3d Cir. 2008)..................................................................................15

*Magma Power Co.* v. *Dow Chem. Co.,*
    136 F.3d 316 (2d Cir. 1998)..................................................................................17

*Malin* v. *XL Capital Ltd.,*
    499 F. Supp. 2d 117 (D. Conn. 2007)..............................................................3, 11

*Mendell In Behalf of Viacom, Inc.* v. *Gollust,*
    909 F.2d 724 (2d Cir. 1990) .................................................................................19

*Mercer* v. *Gupta,*
    712 F.3d 756 (2d Cir. 2013).............................................................................10, 15

*M+J Savitt, Inc.* v. *Savitt,*
    2009 WL 691278 (S.D.N.Y. Mar. 17, 2009) ........................................................18

*Parkcentral Global Hub Ltd.* v. *Porsche Auto. Holdings SE,*
    763 F.3d 198 (2d Cir. 2014) .................................................................................10

*Roth ex rel. Beacon Power Corp.,*
    522 F.3d 242 (2d Cir. 2008) .............................................................................16, 17

*Simmonds* v. *Credit Suisse Sec. (USA) LLC,*
    638 F.3d 1072 (9th Cir. 2011) ...........................................................................18, 19

*Stoner* v. *Walsh,*
    772 F. Supp. 790 (1991) .......................................................................................11

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

### STATUTES

15 U.S.C. § 78p(a) ..................................................................................................3

15 U.S.C. § 78p(b) ........................................................................................ *passim*

### RULES AND REGULATIONS

17 C.F.R. § 240.16b-3.................................................................................... *passim*

17 C.F.R. § 240.16b-6.................................................................................................17

Fed. R. Civ. P. 12(b)(6)...............................................................................................10

Fed. R. Evid. 201 ..................................................................................................9,10

### OTHER AUTHORITIES

Alan L Dye & Peter J Romeo,
    THE SECTION 16 DESKBOOK (Summer 2013)........................................................17

Ownership Reports and Trading by Officers, Directors and Principal Security Holders,
    Exchange Act Release Nos. 34-37260, 35-26524,
    61 Fed. Reg. 30376-01 (June 14, 1996) .............................................................12

Ownership Reports and Trading By Officers, Directors, and Principal Security Holders,
    Exchange Act Release Nos. 17991, 25254, 28869, 34-28869, 35-25254,
    48 S.E.C. Docket 216, 1991 WL 292000 (Feb. 21, 1991) ...............................16, 17

**INTRODUCTION**

Plaintiff John Olagues, a purported shareholder of JPMorgan Chase & Co. ("JPMC"), asserts that James Dimon, the Chairman and Chief Executive Officer of JPMC, earned profits from routine equity compensation transactions that plaintiff alleges were somehow improper.  Plaintiff relies on Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), and contends that "millions of dollars of profits" should be disgorged by Mr. Dimon to JPMC (Am. Compl. ¶ 17).  Plaintiff's claims are untenable and should be dismissed for at least two independent reasons.  First, the dispositions of JPMC stock that form the basis of plaintiff's claims have been expressly exempted from the restrictions of Section 16(b) by the Securities and Exchange Commission ("SEC").  Second, plaintiff failed to make a proper demand on JPMC prior to commencing this lawsuit, as Section 16(b) requires, and thus has no standing here.

Aimed at preventing unfair use of inside information, Section 16(b) requires that profits realized by a director, officer or principal shareholder of a company from any purchase and sale, or any sale and purchase, of that company's equity securities within a period of less than six months be disgorged to the company.  The SEC, however, exempts transactions that do not provide an opportunity for speculative abuse.  Under SEC Rule 16b-3, Section 16(b) does not apply to transactions where a director or officer acquires equity securities from the company, or disposes of equity securities to the company, because neither the company nor the director or officer is considered to be at an informational disadvantage.  *See* 17 C.F.R. § 240.16b-3.

Here, plaintiff complains about transactions carried out solely between Mr. Dimon and JPMC.  Plaintiff alleges that two dispositions of JPMC common stock that Mr. Dimon made to JPMC on March 2, 2012 and January 13, 2013 in connection with his equity compensation constituted "sales" subject to Section 16(b).  (Am. Compl. ¶¶ 13, 15-16.)  Next, pointing to unrelated market purchases of JPMC stock by Mr. Dimon on July 19 and 20, 2012,

and "matching" them to the two dispositions, plaintiff alleges that Mr. Dimon realized profits that are required to be disgorged under Section 16(b).  (Am. Compl. ¶¶ 15-17.)  Plaintiff's allegations fall short and the amended complaint should be dismissed on the following grounds:

*First*, plaintiff has not pled, and cannot plead, that the two dispositions of JPMC stock were non-exempt "sales" within the scope of Section 16(b).  As disclosed in SEC filings upon which plaintiff's amended complaint relies, those dispositions involved stock delivered to, and/or withheld by, JPMC to pay, for example, the taxes due pursuant to the terms of equity compensation awards.  Such transactions are expressly exempt under the plain language of Rule 16b-3(e), and did not create any opportunity for the type of speculative abuse that Section 16(b) was meant to prevent.  Plaintiff's claims thus fail as a matter of law.

*Second*, plaintiff has not pled, and cannot plead, that he made a proper demand to JPMC at least 60 days prior to filing this action, as required by Section 16(b).  Contrary to Section 16(b), plaintiff improperly sought to have Mr. Dimon return a portion of the purported profits to plaintiff himself, rather than to JPMC.  JPMC refused plaintiff's inappropriate request and responded with detailed reasons why his purported Section 16(b) claims had no merit. Having made no valid demand, plaintiff lacks standing to bring this lawsuit.

## BACKGROUND

### A.     The "Short-Swing" Profit Rule

Section 16(b) of the Exchange Act requires that directors, officers and principal shareholders (*i.e.*, corporate insiders) who realize profits "from any purchase and sale, or any sale and purchase, of any equity security" of their own company (*i.e.*, the issuer) within a period of less than six months must disgorge those profits to the company.  15 U.S.C. § 78p(b).  The purpose of this "short-swing" profit rule is to "prevent[] the unfair use of information which may have been obtained by [corporate insiders] by reason of [their] relationship to the issuer."  *Id.*

Congress granted the SEC authority to exempt from the statute's restriction "any transaction or transactions" that the SEC deems to be "not comprehended within the purpose of this subsection."  15 U.S.C. § 78p(b).  Pursuant to that authority, the SEC promulgated Rule 16b-3 to exempt any "transaction between the issuer . . . and an officer or director of the issuer that involves issuer equity securities," as long as certain conditions are met.  17 C.F.R. § 240.16b-3(a).  Specifically, a disposition of equity securities to the issuer is exempt as long as the terms of the disposition are approved in advance by the issuer's board of directors, a committee of the board, or by a majority of shareholders.  17 C.F.R. §§ 240.16b-3(d) & (e).

Section 16(a) requires directors, officers and principal shareholders to disclose, subject to rules set forth by the SEC, their ownership holdings of equity securities of the company, and any changes thereto.  15 U.S.C. § 78p(a).  Non-exempt transactions, and transactions exempt from Section 16(b) pursuant to Rule 16b-3(d) & (e), that result in a change in ownership of the company's equity securities by a director, officer or principal shareholder are required to be disclosed within two business days on an SEC Form 4, which is filed with the SEC under penalty of perjury.  *Malin* v. *XL Capital Ltd.*, 499 F. Supp. 2d 117, 133 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).[1]  The nature of each transaction reportable on a Form 4 filing is disclosed using standard transaction codes set by the SEC.  For example, transaction code "M" means the "[e]xercise or conversion of derivative security exempted pursuant to Rule 16b-3," while transaction code "F" means "[p]ayment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise or vesting of a

---

[1]    Certain transactions exempt from Section 16(b) also may be reported annually on an SEC Form 5.  *See* General Instructions to Form 5, *available at* www.sec.gov/about/forms/form5data.pdf.

security issued in accordance with Rule 16b-3." (Form 4 Instructions at 6, attached hereto as Exhibit A to the Nov. 10, 2014 Declaration of Andrew J. Finn ("Finn Decl.").)

    **B.**    **The 2002 Options Grant to Mr. Dimon and the March 2012 Disposition of JPMC Shares That Resulted in a Net Delivery to Mr. Dimon of 52,833 JPMC Shares**

The first disposition of JPMC stock about which plaintiff complains arose from the exercise of stock options originally granted to Mr. Dimon as equity compensation in April 2002 by Bank One Corporation ("Bank One"). Bank One merged with JPMC in July 2004. Prior to that merger, Mr. Dimon served as Bank One's Chairman and Chief Executive Officer.

Specifically, on April 16, 2002, Bank One's Board of Directors granted Mr. Dimon options to acquire 350,000 shares of Bank One common stock at $41.21 per share, with an expiration date of April 16, 2012. This grant was disclosed to shareholders in a March 3, 2003 Proxy Statement. (March 5, 2003 Bank One Schedule 14A at 13-14, 17, Finn Decl. Ex. B.) The options were granted under Bank One's Stock Performance Plan (the "Bank One Plan"), which authorized payment of the exercise price of stock options "through the delivery or deemed delivery based on attestation to the ownership of shares of Common Stock with a Fair Market Value equal to the total payment due." (Bank One Plan at § 8(e), Finn Decl. Ex. C.)[2] The Bank One Plan further authorized Bank One to "deduct[] from the payment" of shares deliverable "a number of shares the Fair Market Value of which equals the amount required to be withheld" for tax obligations. (Ex. C at § 8(f).) The terms of the 2004 merger between Bank One and JPMC stated that "each outstanding option to purchase [Bank One] common stock was converted to an option to purchase JPM[C] common stock on substantially the same terms, except that the number of shares was adjusted by multiplying the number of [Bank One] options by 1.32 and the

---

[2]    The Bank One Plan, dated February 20, 2001, was filed with the SEC as an exhibit to Bank One's Form 10-K on March 5, 2003. (Finn Decl. ¶ 5.)

exercise price was adjusted by dividing the [Bank One] exercise price by 1.32." (July 2, 2004 Form 4, Finn Decl. Ex. D.)  As a result, Mr. Dimon's Bank One options were converted into options to purchase 462,000 shares of JPMC common stock at $31.22 per share (the "2002 Options").[3]

On March 2, 2012, approximately six weeks before the 2002 Options were scheduled to expire, Mr. Dimon exercised the 2002 Options to acquire all 462,000 shares of JPMC stock.  (March 5, 2012 Form 4, Finn Decl. Ex. G.)  On March 5, 2012, the next business day, JPMC filed a Form 4 with the SEC on Mr. Dimon's behalf, designating the acquisition of those shares as an "[e]xercise or conversion of derivative security exempted pursuant to Rule 16b-3," using the standard transaction code "M."  (Ex. G; Ex. A at 6.)  In order to complete the exercise of the 2002 Options, Mr. Dimon also "disposed of 409,167 shares of JPM[C] Common Stock." (Am. Compl. ¶ 13.)  That disposition was designated in the same Form 4 as a "[p]ayment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise, or vesting of a security issued in accordance with Rule 16b-3," using transaction code "F" (the "March 2012 Disposition").[4]  (Ex. G; Ex. A at 6.)  The March 2012 Disposition and the exercise of the 2002 Options resulted in a net delivery to Mr. Dimon of 52,833 shares.

---

[3]     This stock option conversion was mandated as part of the January 14, 2004 Agreement and Plan of Merger between JPMC and Bank One, which was approved by JPMC shareholders on May 25, 2004 (Jan. 28, 2004 JPMC Form 8-K, Ex. 2.1 at Art. 5.8, Finn Decl. Ex. E; May 27, 2004 JPMC Form 8-K, Finn Decl. Ex. F), and further disclosed in a July 2, 2004 Form 4 filed with the SEC by JPMC on Mr. Dimon's behalf (Ex. D).

[4]     The shares JPMC withheld were valued at $40.555 per share.  (Ex. G.)

**C.     The 2010 and 2011 Restricted Stock Unit Awards and the January 2013 Disposition of JPMC Shares That Resulted in a Net Delivery to Mr. Dimon of 101,911 JMPC Shares**

On February 3, 2010 and February 16, 2011, JPMC's Board of Directors granted Mr. Dimon equity compensation in the form of two restricted stock unit awards (the "RSU Awards"), the terms and conditions of which were filed with the SEC.[5]  The RSU Awards were made pursuant to JPMC's shareholder-approved 2005 Long-Term Incentive Plan (the "2005 Incentive Plan").[6]  Each restricted stock unit "represent[ed] a contingent right to receive one share of JPMC common stock."  (Jan. 16, 2013 Form 4, n.1, Finn Decl. Ex. K.)  With respect to the restricted stock units awarded on February 3, 2010, half vested on January 13, 2012 and the remainder vested on January 13, 2013.  (Ex. K at n.3.)  The restricted stock units awarded on February 16, 2011 were likewise structured so that half vested on January 13, 2013, with the remainder vesting on January 13, 2014.  (Ex. K at n.2.)  The RSU Awards *required* JPMC to "retain from each distribution the number of shares of Common Stock required to satisfy applicable tax obligations."  (Ex. M at 5; Ex. N at 5.)[7]

---

[5]      Specifically, the terms and conditions of the February 3, 2010 award were attached as an exhibit to JPMC's 2009 annual report on a Form 10-K, which was filed with the SEC on February 23, 2010.  (Terms & Conditions of Feb. 3, 2010 Restricted Stock Unit Award ("2010 RSU T&Cs"), Finn Decl. Ex. M.)  The terms and conditions of the February 16, 2011 award were attached as an exhibit to JPMC's 2011 annual report on a Form 10-K, which was filed on February 29, 2012.  (Terms & Conditions of Feb. 16, 2011 Restricted Stock Unit Award ("2011 RSU T&Cs"), Finn Decl. Ex. N.)  These grants are disclosed to shareholders in JPMC's 2011 and 2012 proxy statements.  (April 7, 2011 JPMC Schedule 14A at 14, 16, Finn Decl. Ex. H; April 4, 2012 JPMC Schedule 14A at 18, Finn Decl. Ex. I.)

[6]      JPMC's 2011 annual report disclosed that all stock-based awards to key employees granted in 2010 and 2011 were made under the 2005 Incentive Plan.  (Finn Decl. Ex. J at 222.)

[7]      The 2005 Incentive Plan also authorized JPMC "to retain the number of shares of Common Stock the Fair Market Value of which equals the amount required to be withheld" for tax obligations.  (2005 Incentive Plan § 15(a), Pl.'s Request for Judicial Notice, Doc. 3, Dkt. No. 2.)  The 2005 Incentive Plan was approved by JPMC shareholders at a meeting held on May 17, 2005.  (May 20, 2005 Form 8-K at Item 1.01, Finn Decl. Ex. L.)

On January 13, 2013, certain restricted stock units subject to the RSU Awards vested and Mr. Dimon received a total of 223,559 shares from JPMC. (January 16, 2013 Form 4, n.1, Finn Decl. Ex. K.) On January 16, 2013, JPMC filed a Form 4 with the SEC on Mr. Dimon's behalf, designating the acquisition of those shares as an "[e]xercise or conversion of derivative security exempted pursuant to Rule 16b-3."[8] (Ex. K.) Consistent with the RSU Awards, Mr. Dimon also "disposed of 121,648 shares of Common Stock" (the "January 2013 Disposition"). (Am. Compl. ¶ 15.) That disposition was designated in the same Form 4 as a "[p]ayment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise, or vesting of a security issued in accordance with Rule 16b-3."[9] (Ex. K; Ex. A at 6.) The January 2013 Disposition and the vesting of the RSU Awards resulted in a net delivery to Mr. Dimon of 101,911 shares.

### D.   Mr. Dimon's July 2012 Purchases of JPMC Common Stock

On July 19 and 20, 2012, Mr. Dimon and his spouse purchased 500,000 shares of JPMC common stock in five separate transactions at prices ranging from $34.0179 to $34.4549 per share (the "July 2012 Purchases"). (Am. Compl. ¶ 14.) The July 2012 Purchases were reported in a Form 4 that JPMC filed with the SEC on Mr. Dimon's behalf.[10] (Doc. 6 to Pl.'s Request for Judicial Notice, Dkt. No. 2.)

---

[8]      The acquisition was so-designated using the transaction code "M." (Ex. K.)

[9]      The disposition was so-designated using the transaction code "F." The shares that JPMC withheld were valued at $45.81 per share. (Ex. K.)

[10]     The Form 4 disclosed that Mr. Dimon purchased 360,000 shares directly and 75,000 shares indirectly. In addition, Mr. Dimon's spouse purchased 65,000 shares.

### E.      Plaintiff's "Demand"

By letter dated February 13, 2014, more than a year after the January 2013 Disposition, plaintiff first contacted Mr. Dimon and Anthony Horan, JPMC's Corporate Secretary, asserting that Mr. Dimon had realized a short-swing profit that required disgorgement. Plaintiff stated that the January 2013 Disposition was a "sale" subject to Section 16(b) that occurred within six months of the July 2012 Purchases, and referred to the Form 4 filings for those transactions.  Plaintiff requested that Mr. Dimon "return the profits to the J.P. Morgan shareholders after deducting 10% of the profits and send the 10% to me [plaintiff] at the address below."  (February 13, 2014 Letter, Finn Decl. Ex. O.)  Plaintiff sent a second letter to Messrs. Dimon and Horan, dated February 21, 2014, adding an assertion that the March 2012 Disposition also was a "sale" subject to Section 16(b), and stating without elaboration that "[i]n my view and the view of others, those trades constitute violations of Section 16 b."  (February 21, 2014 Letter, Finn Decl. Ex. P.)

On March 4, 2014, Mr. Horan responded to plaintiff on behalf of JPMC, explaining why the March 2012 Disposition and the January 2013 Disposition were exempt from Section 16(b) pursuant to Rule 16b-3(e).  (Mar. 4, 2014 Letter, Finn Decl. Ex. Q.)  Specifically, Mr. Horan explained that the March 2012 Disposition "was an exempt transaction reflecting the withholding of shares by [JPMC] to satisfy the exercise price and tax payment obligation in connection with the exercise of a stock option granted to Mr. Dimon as equity compensation," and that the January 2013 Disposition "was an exempt transaction reflecting the withholding of shares by [JPMC] to satisfy tax payment obligations in connection with the vesting of equity compensation awards."  (Ex. Q at 1.)  Plaintiff sent a third letter, dated March 17, 2014, in which he conceded that the Form 4 filings disclosing the March 2012 Disposition and the January 2013 Disposition described those transactions as being exempt from Section 16(b).  However, plaintiff

reiterated his unsupported view that those transactions were nevertheless "sales" subject to Section 16(b).  (Mar. 17, 2014 Letter, Finn Decl. Ex. R.)  JPMC responded in a letter from Mr. Horan dated March 20, 2014, again stating that "the dispositions of stock on March 2, 2012 and January 13, 2013 by Mr. Dimon were exempt transactions with the issuer that satisfied all requirements of Rule 16b-3(e)."  (Mar. 20, 2014 Letter, Finn Decl. Ex. S.)

> ### F.    The Amended Complaint

Plaintiff filed a complaint on June 2, 2014.  (Dkt. No. 1.)[11]  On July 11, 2014, plaintiff offered to withdraw his complaint for a payment to him of $225,000 from Mr. Dimon. (July 11, 2014 Email, Finn Decl. Ex. T.)  Mr. Dimon rejected plaintiff's offer in a letter from counsel dated July 31, 2014.  (July 31, 2014 Letter, Finn Decl. Ex. U.)

On October 17, 2014, plaintiff filed an amended complaint alleging that "[t]he July [ ] 2012 Purchases . . . occurred within six months of the March [ ] 2012 Disposition . . . and also occurred with [sic] six months of the January [ ] 2013 Disposition," and that "[t]hese transactions were purchases or sales of securities for Section 16(b) purposes" (Am. Compl. ¶ 16), which resulted in "millions of dollars of profits recoverable under Section 16(b)" (Am. Comp. ¶ 17).  The amended complaint states that plaintiff's "information and belief" concerning those transactions "is based on, among other things, the SEC Form 4s" disclosing the March 2012 Disposition, the January 2013 Disposition and the July 2012 Purchases.  (Am. Compl. ¶ 18.) Plaintiff notably fails to allege, however, why those transactions constituted non-exempt "sales."

---

[11]     On August 6, 2014, plaintiff filed a "Request for Judicial Notice Under Rule 201 Federal Rules of Evidence" attaching 11 exhibits that plaintiff referred to, or relied on, in commencing this lawsuit.  (Dkt. No. 2.)

## STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the Court to dismiss a complaint when it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Gibbons* v. *Malone*, 703 F.3d 595, 599 (2d Cir. 2013) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)) (affirming dismissal of Section 16(b) claim). Although the Court must construe a complaint liberally and "accept[] all factual allegations as true," it need not give "effect to legal conclusions couched as factual allegations," *Mercer* v. *Gupta*, 712 F.3d 756, 758-59 (2d Cir. 2013) (quoting *Starr* v. *Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)), *cert. denied*, 134 S. Ct. 319 (2013), and the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" *Parkcentral Global Hub Ltd.* v. *Porsche Auto. Holdings SE*, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting *Conopco, Inc.* v. *Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)).

In addition to the factual allegations in the complaint, on a motion to dismiss the Court may consider (1) documents attached to or incorporated by reference in the complaint; (2) documents "integral" to the complaint and relied upon in it; (3) disclosure documents filed with the SEC; (4) facts of which judicial notice may be taken pursuant to Rule 201 of the Federal Rules of Evidence; or (5) "documents or information contained in [a] defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint." *Eaves* v. *Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 244 (S.D.N.Y. 2011) (citations omitted). Where a plaintiff must make a demand on a company before commencing suit (as is

the case with Section 16(b)), courts also consider any demand letters and company responses. *See Halebian* v. *Berv*, 631 F. Supp. 2d 284, 294 (S.D.N.Y. 2007); *Stoner* v. *Walsh*, 772 F. Supp. 790, 792 (1991).  Further, "courts in this District routinely take judicial notice of Form 4 filings at the motion to dismiss stage, and consider them for the truth of their contents."  *Abely* v. *Aeterna Zentaris Inc.*, No. 12-CV-4711, 2013 WL 2399869, at *22 (S.D.N.Y. May 29, 2013) (citation omitted).[12]

## ARGUMENT

"To state a claim for disgorgement of short-swing profits under Section 16(b), a plaintiff must allege: (1) *a non-exempt* purchase and subsequent *non-exempt* sale (or a non-exempt sale and subsequent non-exempt purchase) of a class of an issuer's equity securities (2) within a six-month period (3) by a statutory insider."  *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 544, 550 (S.D.N.Y. 2014) (citing *Gwozdzinsky* v. *Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 309 (2d Cir. 1998)) (emphasis added).  Thus, "[t]o plead a plausible claim for a violation of Section 16(b), plaintiff must plead facts sufficient to show that there is the purchase and sale (or sale and purchase) of a security *not otherwise exempt* from Section 16(b)."  *Donoghue* v. *Patterson Companies, Inc.*, 990 F. Supp. 2d 421, 424 (S.D.N.Y. 2013) (citing *Gwozdzinsky*, 156 F.3d at 308-09) (emphasis added); *see also* 15 U.S.C. § 78p(b) ("[Section 16(b)] shall not be construed to cover any transaction . . . which the [S.E.C.] shall by rules and regulations [ ] exempt.").

Plaintiff's amended complaint fails because plaintiff does not state a plausible claim under Section 16(b).  Although the March 2012 Disposition and the January 2013

---

[12]      *See also In re Bear Stearns Companies, Inc. Sec., Derivative & ERISA Litig.*, 763 F. Supp. 2d 423, 583-84 (S.D.N.Y. 2011); *Malin*, 499 F. Supp. 2d at 131-32 ("SEC Forms 3, 4 and 5, are referenced in the [complaint] and therefore are properly incorporated by reference").

Disposition were made within six months of the July 2012 Purchases, plaintiff has failed to plead facts sufficient to show that these were non-exempt "sales."  Nor could he.  The Form 4 filings on which plaintiff's amended complaint expressly relies, together with other SEC filings made by JPMC and Bank One, establish that these purported "sales" of JPMC shares that plaintiff seeks to match with the July 2012 Purchases were exempt by Rule 16b-3(e) as pre-approved dispositions to JPMC.  Moreover, the March 2012 Disposition and January 2013 Disposition were made pursuant to equity compensation plans and are not the type of dispositions that Section 16(b)'s restrictions are meant to restrict.  Further, plaintiff lacks standing to pursue this litigation as he failed to make a proper demand to JPMC prior to filing his complaint.

**I.      Plaintiff Has Not Pled That There Were Any Non-Exempt "Sales" of JPMC Stock Subject to Section 16(b).**

**A.      The March 2012 Disposition and the January 2013 Disposition Were Exempt Transactions Under Rule 16b-3(e) Because They Were Authorized Dispositions to the Issuer.**

As long as the terms are approved in advance by the issuer's board of directors, a committee of the board, or shareholders, Rule 16b-3(e) "exempt[s] dispositions of issuer equity securities to the issuer pursuant to . . . the right to have securities withheld, or to deliver securities already owned, either in payment of the exercise price of an option or to satisfy the tax withholding consequences of an option exercise or the vesting of restricted securities." Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release Nos. 34-37260, 35-26524, 61 Fed. Reg. 30376-01 (June 14, 1996); 17 C.F.R.

§§ 240.16b-3(d) & (e).[13]  The amended complaint fails to allege adequately that Mr. Dimon made any non-exempt "sales" subject to Section 16(b).

Rather, the SEC Form 4 filings to which the amended complaint refers clearly indicate the dispositions at issue were exempt.  (*See* Compl. ¶¶ 13, 15.)  As expressly indicated on those filings, both the March 2012 Disposition and the January 2013 Disposition constituted the "[p]ayment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise, or vesting of a security issued in accordance with Rule 16b-3," an SEC exemption to Section 16(b).[14]  (Ex. A (Form 4 Instructions) at 6; Ex. G (March 5, 2012 Form 4); Ex. K (Jan. 16, 2013 Form 4).)  Indeed, the only reasonable inference from the sparse allegations in the amended complaint, together with information disclosed in SEC filings upon which plaintiff relies, is that both the March 2012 Disposition and the January 2013 Disposition were routine pre-approved transactions between Mr. Dimon and JPMC arising from equity compensation awards, and thus exempt under Rule 16b-3(e).

---

[13]     Under Rule 16b-3, an issuer such as JPMC (or Bank One) is free to approve through its shareholders, board of directors or a committee of the board, "each specific transaction" or "a plan pursuant to which the terms and conditions of each transaction are fixed in advance." 17 C.F.R. § 240.16b-3 n.3 ("Where the terms of a subsequent transaction (such as the exercise price of an option, or the provision of an exercise or tax withholding right) are provided for in a transaction as initially approved . . . such subsequent transaction shall not require further specific approval."); *Gryl ex rel. Shire Pharm. Grp. PLC* v. *Shire Pharm. Grp. PLC*, 298 F.3d 136, 145-46 (2d Cir. 2002) ("So long as the relevant securities transaction is between an issuer and insider, and . . . the terms and conditions of that transaction receive advance approval by the board of directors, there exists sufficient protection to ensure that any short-swing profit taking that follows is not the result of unfair market manipulation.").

[14]     Although plaintiff's original complaint made several conclusory (and incorrect) allegations about why those dispositions were not exempt under Rule 16b-3(e), plaintiff's amended complaint makes absolutely no attempt to do so.

1. The March 2012 Disposition to JPMC To Pay the Purchase Price and Tax Obligations When the 2002 Options Were Exercised Is Exempt Under Rule 16b-3(e) Because It Was an Authorized Disposition to the Issuer.

The terms of the March 2012 Disposition, a transaction that coincided with the exercise of the 2002 Options, were set and approved well in advance by both Bank One's Board of Directors (at the time of the original April 2002 grant) and later by JPMC's Board of Directors and shareholders (by approving the July 2004 merger).  The stock incentive plan pursuant to which the 2002 Options were granted (the Bank One Plan) specifically contemplated and authorized delivery and/or withholding of shares to pay both the exercise price and/or tax obligations at the time of exercising those options.  *See supra*, pp. 4-5.  This is precisely what the March 5, 2012 Form 4 filing indicated occurred (Ex. G), and is more than sufficient to meet the exemption pursuant to Rule 16b-3(e).  *See Donoghue* v. *Casual Male Retail Group, Inc.*, 427 F. Supp. 2d 350, 356 (S.D.N.Y. 2006) ("[N]either the fact that [defendant] could exercise its options at any time during a three-year period, nor the fact that it could choose among a certain number of ways of paying the exercise price, placed the Option Agreement beyond the scope of Rule 16b-3 exemption.").

2. The January 2013 Disposition to JPMC To Pay Tax Obligations When the 2013 RSUs Vested Is Exempt Under Rule 16b-3(e) Because It Was an Authorized Disposition to the Issuer.

Likewise, the terms of the January 2013 Disposition, which coincided with the vesting of restricted stock units, were set and approved by JPMC's Board of Directors (and the shareholder-approved 2005 Incentive Plan).  The RSU Awards required JPMC "to retain from each distribution the number of shares of Common Stock required to satisfy applicable tax obligations."  (Ex. M at 5; Ex. N at 5.)  As indicated on the Form 4 filed with respect to this transaction, the January 2013 Disposition was a "[p]ayment of . . . tax liability by delivering or

withholding securities incident to the . . . vesting of a security," and thus exempt under Rule 16b-3(e).  (Ex. K; Ex. A at 6.)

**B.      The March 2012 Disposition and the January 2013 Disposition Are Not "Sales" Under Section 16(b).**

Even if the March 2012 Disposition and the January 2013 Disposition did not fall squarely within the exemption of Rule 16b-3(e)—and they do—those dispositions would not constitute "sales" for Section 16(b) purposes because they were not the type of transactions that "may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information." *Kern Cnty. Land Co.* v. *Occidental Petroleum Corp.*, 411 U.S. 582, 594-95 (1973).  In enacting Section 16(b), "Congress recognized that insiders may have access to information about their corporations not available to the rest of the investing public.  By trading on this information, these persons could reap profits at the expense of less well informed investors." *Foremost-McKesson, Inc.* v. *Provident Sec. Co.*, 423 U.S. 232, 243 (1976); *see Mercer*, 712 F.3d at 757-58 (Section 16(b) "is designed to prevent statutory insiders . . . from engaging in speculative transactions on the basis of information not available to others" (internal quotation marks and citation omitted)), *cert. denied*, 134 S. Ct. 319 (2013).[15]  Thus, "[i]n deciding whether borderline transactions are within the reach of the statute, the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information." *Kern Cnty. Land Co.*, 411 U.S. at 594-95.  When a corporate insider engages in an "involuntary transaction . . . having no access to inside information," Section 16(b) does not

---

[15]      In promulgating Rule 16b-3, the SEC also recognized that "the purchase of securities from, or sale of securities to, the issuer by a director or officer does not present the same informational asymmetry, and associated opportunity for speculative abuse, that, according to the Supreme Court, Congress was targeting in enacting section 16(b)." *Levy* v. *Sterling Holding Co., LLC*, 544 F.3d 493, 505 (3d Cir. 2008).

apply because such a transaction does not create the potential for speculative abuse.  *At Home Corp.* v. *Cox Commc'ns, Inc.*, 446 F.3d 403, 408 (2d Cir. 2006).  The March 2012 Disposition and the January 2013 Disposition meet this test.

Here, the March 2012 Disposition and the January 2013 Disposition were made following the terms of equity compensation that the JPMC Board (and, in the case of the March 2012 Disposition, the Bank One Board)—not Mr. Dimon—determined in advance.  With respect to both dispositions to JPMC, Mr. Dimon is not alleged to have had any control over the amount of the tax or purchase price payment made to JPMC.  Those amounts were determined by JPMC at the time of the exercise (with respect to the 2002 Options) and the time of vesting (with respect to the RSUs) based on the terms of Mr. Dimon's equity compensation that were set in 2002, 2010 and 2011, when that compensation was granted.[16]  Moreover, as the Second Circuit recognized in upholding the SEC's promulgation of part of Rule 13b-3, "issuer-insider transactions, where both parties have the benefit of 'insider' information, are not comprehended within the purpose of Section 16(b)," which is to "prevent[] insiders from taking advantage of 'information not available to others.'"  *Roth ex rel. Beacon Power Corp.*, 522 F.3d 242, 249

---

[16]      Indeed, any potential opportunity to profit from the use of inside information arose, if ever, at the time the 2002 Options and RSU Awards were granted in 2002, 2010 and 2011.  *See Chechele* v. *Sperling*, 758 F.3d 463, 470 (2d Cir. 2014) ("the last opportunity to use inside information occur[ed], and [ ] the six-month clock for a matching sale [ ] start[ed]" when terms of options fixed); *see also Roth*, 740 F.3d at 870-71; *Analytical Surveys, Inc.* v. *Tonga Partners, L.P.*, 684 F.3d 36, 49 (2d Cir. 2012), *as amended* (July 13, 2012); Ownership Reports and Trading By Officers, Directors, and Principal Security Holders, Exchange Act Release Nos. 17991, 25254, 28869, 34-28869, 35-25254, 48 S.E.C. Docket 216, 1991 WL 292000, at *12 (Feb. 21, 1991).  Thus, the potential to profit ended, at the latest, when the options were exercised or when the restricted stock vested.  With respect to at least the March 2012 Disposition, this occurred more than two years before plaintiff commenced this lawsuit. 15 U.S.C. § 78p(b) (lawsuit to recover short-swing profits "shall be brought more than two years after the date such profit was realized").

(2d Cir. 2008) (citation omitted).  Thus, there was no plausible opportunity for any speculative abuse using inside information.

Further, the SEC has also exempted the transactions that triggered the March 2012 Disposition and the January 2013 Disposition—the exercise of a stock option and vesting of a restricted stock unit granted as equity compensation—as not comprehended within the purpose of Section 16(b).  *See* 17 C.F.R. § 240.16b-6(b) (exercise of option "shall be exempt from the operation of section 16(b) of the Act, and the acquisition of underlying securities at a fixed exercise price due to the exercise or conversion of a call equivalent position . . . shall be exempt from the operation of section 16(b) of the Act"); Ownership Reports and Trading By Officers, Directors, and Principal Security Holders, Exchange Act Release Nos. 17991, 25254, 28869, 34-28869, 35-25254, 48 S.E.C. Docket 216, 1991 WL 292000, at *23 (Feb. 21, 1991) ("The vesting of the stock . . . is not a reportable event for purposes of Section 16.").  Indeed, after a stock option is granted to a corporate insider "the potential for abuse of inside information is minimal," and thus "the exercise of a fixed-price option is a non-event for 16(b) purposes." *Magma Power Co.* v. *Dow Chem. Co.*, 136 F.3d 316, 322 (2d Cir. 1998).  Likewise, the vesting of restricted stock is "not a recognizable event for purposes of Section 16."  Alan L. Dye & Peter J. Romeo, THE SECTION 16 DESKBOOK, 681-82, § V(D)(1)(b) (Summer 2013) (citation omitted).

In short, the March 2012 and January 2013 Dispositions did not create any plausible opportunity for abusive trading and thus were not "sales" under Section 16(b).

## II.     Plaintiff Lacks Standing to Bring This Lawsuit Because His "Demand" to JPMC Was Inadequate.

Plaintiff's amended complaint also fails because plaintiff lacks standing to bring Section 16(b) claims against Mr. Dimon, having failed to make a proper demand on JPMC. Under Section 16(b), the "owner of any security of the issuer" may bring a lawsuit "in the name

-17-

and in behalf of the issuer" only if the company refuses or fails to bring suit within 60 days after

a demand to do so is made, or the company otherwise "fail[s] diligently to prosecute."  15 U.S.C.

§ 78p(b).  The sufficiency of a demand is governed by the law of the issuer's state of

incorporation, *Simmonds* v. *Credit Suisse Sec. (USA) LLC*, 638 F.3d 1072, 1088 (9th Cir. 2011),

*vacated and remanded on other grounds*, 132 S. Ct. 1414 (2012), which, for JPMC, is Delaware.

(Am. Compl. ¶ 7 (alleging JPMC is "incorporated under Delaware law").)  Under Delaware law,

a demand letter must "specifically state (i) the identity of the alleged wrongdoer[], (ii) the

wrongdoing . . . allegedly perpetrated and the resultant injury to the corporation, and (iii) the

legal action the shareholder wants the board to take on the corporation's behalf."  *Simmonds*, 638

F.3d at 1088 (dismissing Section 16(b) cases for inadequate demand).  As with any other

derivative action, this demand requirement is meant "first to insure that a stockholder exhausts

his intracorporate remedies, and then to provide a safeguard against strike suits."  *Id.* at 1089

(citation omitted); *see M+J Savitt, Inc.* v. *Savitt*, 2009 WL 691278 (S.D.N.Y. Mar. 17, 2009)

(demand requirement designed "to discourage strike suits commenced by shareholders for

personal gain rather than for the benefit of the corporation" (citations and internal quotation

marks omitted)).

　　　　　The amended complaint's allegation that plaintiff "notified JPM[C] of the facts

alleged [in the amended complaint] more than sixty days prior to filing the initial Complaint"

(Am. Compl. ¶ 19) is not enough.  Such a conclusory allegation fails to establish that plaintiff

"clearly and specifically" identified any wrongdoing (*e.g.*, a non-exempt "sale" subject to

Section 16(b) within six months of the July 2012 Purchases) or identified any appropriate legal

action for JPMC's Board to take (*e.g.*, disgorgement to JPMC).  *Simmonds*, 638 F.3d at 1093

(shareholder has burden to show demand "clearly and specifically" identified the wrongdoing

and legal action to be taken) (citing *Yaw* v. *Talley*, No. CIV-A-12882, 1994 WL 89019, at *8 (Del. Ch. Mar. 2, 1994)).  Nor could plaintiff plead a proper demand was made.  Plaintiff's letters to Mr. Dimon and JPMC's Corporate Secretary, like the amended complaint, did not specify any non-exempt "sale" of JPMC stock that Mr. Dimon made.  Moreover, plaintiff did not make a request on behalf of the issuer, JPMC.  Rather, plaintiff improperly demanded that he be sent 10% of the alleged short-swing profits for his own personal gain in exchange for not proceeding with a threatened lawsuit.  "Successful plaintiffs in section 16(b) suits are not personally entitled to receive any portion of the recovered damages."  *Klein ex rel. SICOR, Inc.* v. *Salvi*, No. 02-CV-1862, 2004 WL 596109, at *1 (S.D.N.Y. Mar. 30, 2004), *aff'd sub nom.*, *Klein* v. *Salvi*, 115 F. App'x 515 (2d Cir. 2004).  Thus, rather than provide notice with specificity of a Section 16(b) claim, plaintiff's "notice" merely sought an unwarranted personal windfall.[17] Because plaintiff has not met a condition for commencing a lawsuit pursuant to Section 16(b), he lacks standing to bring this case.

---

[17]     In addition, plaintiff addressed his "demand" to Mr. Dimon and JPMC's Corporate Secretary, not to JPMC's Board of Directors or a "comparable authority," as the rules governing demands generally require.  Fed. R. Civ. P. 23.1(b)(3)(A); *see Kaster* v. *Modification Sys., Inc.*, 731 F.2d 1014, 1017 (2d Cir. 1984) (demand on company president and chairman insufficient because that individual was "not invested with the full powers of the board of directors"). Although the Second Circuit has not yet ruled on the contours of the demand requirement for a Section 16(b) claim for purposes of standing, *c.f.*, *Mendell In Behalf of Viacom, Inc.* v. *Gollust*, 909 F.2d 724, 728-29 (2d Cir. 1990) (addressing Section 16(b) standing of plaintiff whose shares of issuer stock were involuntarily divested after commencing suit), *aff'd sub nom. Gollust* v. *Mendell*, 501 U.S. 115 (1991), a fundamental "purpose behind the demand requirement is to give the *directors of a corporation* 'the initial opportunity to redress the wrong.'"  *Levner* v. *Saud*, 903 F. Supp. 452, 456 (S.D.N.Y. 1994) (citation omitted) (emphasis added), *aff'd sub nom.*, *Levner* v. *Prince Alwaleed*, 61 F.3d 8 (2d Cir. 1995).

## CONCLUSION

Because plaintiff has failed to state a claim upon which relief may be granted under Section 16(b), the complaint should be dismissed.

Dated: November 10, 2014
　　　　New York, New York

/s/ Sharon L. Nelles

Sharon L. Nelles
Andrew J. Finn
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
nelless@sullcrom.com

*Attorneys for Defendants James
Dimon and JPMorgan Chase & Co.*