**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOHN OLAGUES,

                                    Plaintiff,                                    1:14-cv-4872-GHW

                    -v-

JAMES DIMON and
JPMORGAN CHASE & CO.,

                                    Defendants.

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Jack G. Fruchter
Mark S. Hamill
One Pennsylvania Plaza, Suite 2805
New York, New York 10119
Tel.: (212) 279-5050
Fax: (212) 279-3655

**Attorneys for Plaintiff John Olagues**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................................1

SUMMARY OF FACTS ...............................................................................................................3

PLEADING STANDARD ..............................................................................................................5

THE SECTION 16(b) CLAIM .......................................................................................................5

JUDICIAL NOTICE ....................................................................................................................7

ARGUMENT ..............................................................................................................................8

I.      Defendants Cannot Establish the Rule 16b-3(e) Advance Approval Exemption ................8

II.     The March 2012 Disposition Is A "Sale" and Is Not An "Unorthodox Transaction" Under Section 16(b)....................................................................................................14

III.    Plaintiff's Demand Satisfies Section 16(b)......................................................................18

CONCLUSION ..........................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Analytical Surveys, Inc. v. Tonga Partners, L.P.*,
  684 F.3d 36 (2d Cir. 2012)..................................................................................17

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................5

*At Home Corp. v. Cox Communications, Inc.*,
  446 F.3d 403 (2d Cir. 2006)..........................................................................15, 16

*Building Industry Elec. Contractors Ass'n v. City of New York*,
  678 F.3d 184 (2d Cir. 2012)................................................................................5

*Chechele v. Sperling*,
  758 F.3d 463 (2d Cir. 2014)..........................................................................16, 17

*Colan v. Mesa Petroleum Co.*,
  951 F.2d 1512 (9th Cir. 1991) ..........................................................................15

*Donoghue v. Bulldog Investors Gen. P'ship*,
  696 F.3d 170 (2d Cir. 2012)................................................................................6

*Donoghue v. Natural Microsystems Corp.*,
  198 F. Supp. 2d 487 (S.D.N.Y. 2002)..................................................................6

*Eaves v. Designs for Fin., Inc.*,
  785 F. Supp. 2d 229 (S.D.N.Y. 2011).................................................................11

*Freidus v. Barclays Bank PLC*,
  734 F.3d 132 (2d Cir. 2013)................................................................................5

*Gollust v. Mendell*,
  501 U.S. 115 (1991)............................................................................................6

*Gratz v. Claughton*,
  187 F.2d 46 (2d Cir. 1951)..................................................................................6

*Gwozdzinsky ex rel. Revco D.S. v. Zell/Chilmark Fund, L.P.*,
  156 F.3d 305 (2d Cir. 1998)...........................................................................5-6

*Heublein v. General Cinema Corp.*,
  722 F.2d 29 (2d Cir. 1983).............................................................................15-16

*Huppe v. WCPS Int'l Inc.*,
    670 F.3d 214 (2d Cir. 2012).................................................................16

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig*.,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011)...............................................7

*Kamen v. Kemper Fin. Servs.*,
    500 U.S. 90 (1991)..............................................................................18

*Kern County Land Co. v. Occidental Petroleum Corp.*,
    411 U.S. 582 (1973)....................................................................14, 15

*No Hero Enters. B.V. v. Loretta Howard Gallery Inc.*,
    No. 13 Civ. 846, 2014 U.S. Dist. LEXIS 63164 (S.D.N.Y. May 7, 2014).........................5

*Perine v. William Norton & Co.*,
    509 F.2d 114 (2d Cir. 1974)...............................................................6

*Roth ex rel. Beacon Power Corp. v. Perseus, L.L.C.*,
    522 F.3d 242 (2d Cir. 2008)...............................................................17

*Roth v. Goldman Sachs Grp., Inc.*,
    740 F.3d 865 (2d Cir. 2014).........................................................6, 17

*Simmonds v. Credit Suisse Sec. (USA) LLC*,
    638 F.3d 1072 (9th Cir. 2010) .....................................................18, 19

*Texas Int'l Airlines v. National Airlines, Inc.*,
    714 F.2d 533 (5th Cir. 1983) ............................................................15

*Yaw v. Talley*,
    No. Civ-A-12882, 1994 Del. Ch. LEXIS 35 (Del. Ch. Mar. 2, 1994).............................19

**Statutes and Rules**

15 USCS § 78p ................................................................................................................18

15 U.S.C. § 78p(b) .................................................................................................1, 5, 18

17 C.F.R. § 240.16b-3 .......................................................................................................7, 13

17 C.F.R. § 240.16b-3(e) ..................................................................................... *passim*

17 C.F.R. § 240.16b-3(d)(1) ........................................................................................6, 7

17 C.F.R. § 240.16b-3(d)(2) ........................................................................................6, 7

61 Fed. Reg. 30376 ...........................................................................................................14

**Other Authority**

Arnold S. Jacobs, SECTION 16 OF THE SECURITIES EXCHANGE ACT,
    3-465, § 3.75 (July 2002) ..........................................................................................13, 14

Peter J. Romeo & Alan L. Dye, COMPREHENSIVE SECTION 16 OUTLINE,
    540, § IV(F)(6) (June 2005) ...........................................................................................13

Telephone Interpretations Manual, No. R. 45 (July 1997) ..........................................13

Plaintiff John Olagues ("Plaintiff") respectfully submits this memorandum of law in opposition to the motion to dismiss the Amended Complaint (the "Amended Complaint" or "Am. Compl."), filed by James Dimon and JPMorgan Chase & Co. ("JPM," "JPMC"or the "Firm") (collectively, "Defendants").  In the Amended Complaint, Plaintiff has stated sufficiently a claim under Section 16(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), [15 U.S.C. § 78p(b)] ("Section 16(b)") in order to recover short-swing insider trading profits realized by Mr. Dimon while he was an insider of the Firm.

## PRELIMINARY STATEMENT

This case boils down to one contested issue – whether defendant James Dimon's March 2, 2012 disposition of 409,167 shares of JPMorgan Chase & Co. common stock (the "March 2012 Disposition) was exempt from Section 16(b) of the Exchange Act pursuant to Rule 16b-3(e).  In compliance with Rule 8 pleading standards, the Amended Complaint adequately alleges the facts of this disposition and (within six months) a matching purchase, as well as that Mr. Dimon is a statutory insider of JPMC subject to the disgorgement of short-swing profits realized from that purchase and sale of JPMC securities pursuant to Section 16(b) of the Exchange Act ("Section 16(b)").  (Am. Compl. ¶¶ 2-3, 13-14, 16-17).  Defendants have attempted but failed to establish a defense for the disposition.

In connection with the March 2012 Disposition, Dimon first acquired 462,000 shares of JPMC common stock.  Then, Mr. Dimon voluntarily disposed of 409,167 of those shares to JPMC as reflected in his Form 4 filing.  The vast majority of the shares that Mr. Dimon disposed of to JPMC were to pay the exercise price of the stock options (*i.e.*, a "cashless exercise"), and the balance of the shares were to pay tax withholding amounts.  Had Mr. Dimon elected to do so, he could have paid the exercise price and the tax withholding with cash from sources other than the sale of shares back to JPMC.

1

Section 16(b) requires company insiders (and specifically, officers) to disgorge any profits earned through short-swing insider trading (*i.e.,* purchases and sales, or sales and purchases, of the company's securities, within a six month period).  There is no dispute that as Chairman, CEO and President of JPMC, Mr. Dimon is an "insider" of JPMC for Section 16(b) purposes.  Mr. Dimon purchased 500,000 shares of JPMC common stock ("Common Stock") on July 19-20, 2012 in the open market (the "July 2012 Purchases"); an unquestionably non-exempt purchase.  Matchable against the July 2012 Purchases are Mr. Dimon's sale of JPMC common stock in the March 2012 Disposition, for which Defendants cannot establish an exemption.  The March 2012 Disposition occurred within six months of the July 2012 Purchases; thus, Mr. Dimon must disgorge to JPMC his profits from that trading activity.

Defendants contend that the March 2012 Disposition – identified in a Form 4 filing as a sale of stock back to JPMC – is exempt from Section 16(b), and therefore is not matchable against the July 2012 Purchases.  In particular, Defendants contend that the disposition qualifies for the Rule 16b-3(e) *Dispositions to the issuer* exemption.  That contention is in error because the advance approval necessary for the exemption to be applicable was lacking for the following reasons: (i) Dimon disposed of JPMC Common Stock to JPMC; therefore, the purported Bank One advance approval upon which Defendants rely did not cover or relate to Dimon's disposition of JPMC stock in connection with the exercise of his JPMC stock options and JPMC did not approve that transaction in advance; and (ii) the purported Bank One advance approval upon which Defendants rely is not specific enough to satisfy Rule 16b-3(e) requirements and does not say what Defendants say it says.  In particular, for the March 2012 Disposition, Defendants rely on purported advance approvals within a Bank One Plan that: (i) authorized a Bank One committee to determine the manner of payment for which a payment that is due to Bank One to

2

pay for the exercise of Bank One stock options (but Defendants do not show that any Bank One committee acted on that authority to specifically authorize the withholding of shares, *i.e.*, a cashless exercise, to satisfy that payment), and (ii) were superseded by JPMC shareholder approval of the relevant JPMC Long-Term Incentive Plan ("Incentive Plan").  When Mr. Dimon completed the March 2012 Disposition, JPMC had a single Incentive Plan.  Bank One options that had been converted to JPMC options in 2004 were governed by the JPMC Incentive Plan on all matters except for carry forward of the number of shares and expiration date and conversion of the exercise price.  That governing Incentive Plan also did not contain the purported advance approvals upon which Defendants mistakenly rely in claiming the Rule 16b-3(e) advance approval exemption.[1]

## SUMMARY OF FACTS

Bank One merged with JPMC in July 2004.  Def. Br. at 4.  Prior to the merger, Dimon served as Bank One's Chairman and Chief Executive Officer.  *Id*.  On April 16, 2002, Bank One granted Dimon options to acquire 350,000 shares of Bank One common stock at $41.21 per share, with an expiration date of April 16, 2012.  *Id*.  The options were granted under Bank One's Stock Performance Plan (the "Bank One Plan").  *Id*.  The Bank One Plan vested the Organization, Compensation and Nominating Committee of the Board with the power to determine the manner in which stock option exercise price payments may be made by plan participants.  (*See* Bank One Plan at §8(e), Def. Ex. C, Dkt. 26-3.)  No such Committee determination is made in the Bank One Plan.  The Bank One Plan explicitly authorized the

---

[1] Based on specific approvals that Defendants provided with their motion to dismiss but did not provide in the lengthy demand process in this matter, it appears that Mr. Dimon's sale of JPMC Common Stock to JPMC on January 12, 2013 (the "January 2013 Disposition") for tax withholding relating to his Restricted Stock Unit Awards (the "RSU Awards") may qualify for the Rule 16b-3(e) exemption for dispositions to the issuer that were approved in advance. (*See* Def. Ex. M and N, Dkt. 26-13 and 26-14.)

withholding of shares of common stock in payment of tax withholding in the case of awards granted in shares of stock. (Bank One Plan at §8(f)(ii), Def. Ex. C, Dkt. 26-3.)  The terms of the Bank One/JPMC merger stated that each outstanding option to purchase Bank One common stock was converted to an option to purchase JPMC common stock on substantially the same terms.  Def. Br. at 4.  On July 1, 2004, Dimon filed a Form 4 with the SEC designating the disposition of the options to acquire 350,000 Bank One shares as a disposition to the issuer (attached hereto as Exhibit 1 to the Nov. 24, 2014 Declaration of Jack G. Fruchter ("Fruchter Decl.").  The Remarks state:

> (1) Shares disposed of in the merger between Bank One Corporation (ONE) & JP Morgan Chase & Co. (JPM), pursuant to which each share of ONE common stock was exchanged for 1.32 shares of JPM common stock, having a market value of $38.77 per share on the effective date of the merger.

> (2) In the merger of ONE and JPM, each outstanding option to purchase ONE common stock was converted to an option to purchase JPM common stock on substantially the same terms, except that the number of options was adjusted by multiplying the number of ONE options by 1.32 and the exercise price was adjusted by dividing the ONE exercise price by 1.32.

(*Id*. Remarks 1 and 2).  On July 2, 2004, Dimon filed another Form 4 as an officer and director of JPMC reporting the acquisition of 462,000 JPMC options with an exercise price of $31.22 and an expiration date of April 16, 2012.  (Def. Ex. D, Dkt. 26-4.)  The Remarks state:

> (1) Shares received in the merger between Bank One Corporation (ONE) & JP Morgan Chase & Co. (JPM), pursuant to which each share of ONE common stock was exchanged for 1.32 shares of JPM common stock, having a market value of $38.77 per share on the effective date of the merger.

> (2) Options received in the merger of ONE & JPM, pursuant to which each outstanding option to purchase ONE common stock was converted to an option to purchase JPM common stock on substantially the same terms, except that the number of shares was adjusted by multiplying the number of ONE options by 1.32 and the exercise price was adjusted by dividing the ONE exercise price by 1.32.

(*Id*. Remarks 1 and 2).

It is undisputed that Mr. Dimon was at all relevant times and remains an "officer" of JPMC subject to the strict liability provisions of Section 16(b). (*See* Am. Compl. ¶¶ 2-3.) It is also undisputed that Mr. Dimon disposed of 409,167 shares of JPMC Common Stock in the March 2012 Disposition and purchased 500,000 shares of Common Stock of JPMC in the July 2012 Purchases. (*See* Am. Compl. ¶¶ 13-14.) Defendants concede that these transactions were made within six months of each other. *See* Def. Br. at 11-12.

## PLEADING STANDARD

"In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *No Hero Enters. B.V. v. Loretta Howard Gallery Inc.*, No. 13 Civ. 8464, 2014 U.S. Dist. LEXIS 63164, at *7 (S.D.N.Y. May 7, 2014) (Woods, J.) (citing *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 137 (2d Cir. 2013). "Additionally, the Court may consider 'only the complaint and any documents attached thereto or incorporated by reference and documents upon which the complaint relies heavily.'" *Id.* (quoting, with internal quotation marks omitted, *Building Industry Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 187 (2d Cir. 2012)). "To survive a motion to dismiss, a complaint must contain 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* (quoting, with internal quotation marks omitted, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## THE SECTION 16(b) CLAIM

Section 16(b) is a statutory right intended to "prevent[ ] the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the issuer. . . ." 15 U.S.C. § 78p(b) (2014). Liability exists where there was "(1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer … (4) within a six-month period." *Gwozdzinsky ex rel. Revco D.S. v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308

(2d Cir. 1998) (citing cases). Section 16(b) implements this vital component of the federal securities laws through a statutory scheme of strict liability and disgorgement of profits when its terms are violated regardless of any degree of fault. *See*, *e.g.*, *Gollust v. Mendell*, 501 U.S. 115, 122 (1991); *Donoghue v. Natural Microsystems Corp.*, 198 F. Supp. 2d 487, 491 (S.D.N.Y. 2002) (Sweet, J.) (citing cases).  Departure from the "flat rules" of Section 16(b) is permitted "in a very limited number of situations."  *Roth v. Goldman Sachs Grp., Inc.*, 740 F.3d 865, 869 (2d Cir. 2014).

The disgorgement remedy is well-recognized, with a 40 year history in the Second Circuit.  *Perine v. William Norton & Co.*, 509 F.2d 114, 117 (2d Cir. 1974).  "Drawing an analogy between trust law and the fiduciary duty created by § 16(b), Judge Hand observed that '[n]obody is obliged to become a director, an officer, or a 'beneficial owner'; just as nobody is obliged to become the trustee of a private trust; but, as soon as he does so, he accepts whatever are the limitations, obligations and conditions attached to the position, and any default in fulfilling them is as much a 'violation' of law as though it were attended by the sanction of imprisonment." *Donoghue v. Bulldog Investors Gen. P'ship*, 696 F.3d 170, 177 (2d Cir. 2012) (quoting *Gratz v. Claughton*, 187 F.2d 46, 49 (2d Cir. 1951) (emphasis added by the Second Circuit in *Donoghue*).

Dispositions to the issuer are exempt under Rule 16b-3(e) if they are "approved in advance in the manner prescribed by either" Rule 16b-3(d)(1) or (d)(2).  17 C.F.R. § 240.16b-3(e).  Rule 16b-3(d)(1) prescribes approval "by the board of directors of the issuer, or a committee of the board of directors that is composed solely of two or more Non-Employee Directors."  17 C.F.R. § 240.16b-3(d)(1).  Rule 16b-3(d)(2) prescribes approval or ratification by shareholders.  17 C.F.R. § 240.16b-3(d)(2).

The "approval conditions" of Rule 16b-3(d)(1) and (d)(2) "require the approval of each specific transaction, and are not satisfied by approval of a plan in its entirety except for the approval of a plan pursuant to which the terms and conditions of each transaction are fixed in advance, such as a formula plan." 17 C.F.R. § 240.16b-3 note 3.

## JUDICIAL NOTICE

Defendants ask the Court to take judicial notice of several documents, including Form 4 and other SEC filings. Def. Br. at 10-11. As to the Form 4 filings, Courts have accepted the truth of the contents to show stock purchases and sales. *See*, *e.g.*, *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig*., 763 F. Supp. 2d 423, 583-84 (S.D.N.Y. 2011). On the other hand, to the extent that Defendants suggest that the Court should take judicial notice of the truth behind the transaction codes in the Form 4 filings, Plaintiff objects. For example, Mr. Dimon selected transaction code "F" for the March 2012 Disposition to JPMC, thereby claiming the Rule 16b-3(e) advance approval exemption. Plaintiff contests that Mr. Dimon's sale of stock back to JPMC properly qualifies for the Rule 16b-3(e) advance approval exemption, and Defendants cite no cases to establish that the Court should take judicial notice of the truth of an exemption merely because a Section 16(b) defendant has claimed the exemption in a Form 4 filing.

**ARGUMENT**

**I.      Defendants Cannot Establish the Rule 16b-3(e) Advance Approval Exemption**

Defendants fail to establish the Rule 16b-3(e) advance approval exemption for dispositions to the issuer – in this case, for Mr. Dimon's disposition of JPMC common stock to JPMC for payment of the exercise price when exercising JPMC stock options or for tax withholding.  Defendants concede that to establish the exemption in this case, the terms of the dispositions must have been "approved in advance by the issuer's board of directors, a committee of the board, or shareholders."  Def. Br. at 12.

For the March 2012 Disposition, Defendants do not claim that there was advance approval of the specific transaction.  Instead, Defendants rely on purported advance approvals of the Bank One Plan but those approvals were superseded by the JPMC Incentive Plan.  The JPMC Incentive Plan governs here (JPMC shareholders approved the JPMC Incentive Plan in 2005 and 2011).

According to Defendants, the March 2012 Disposition "arose from the exercise of stock options originally granted to Mr. Dimon as equity compensation in April 2002 by Bank One Corporation" when Mr. Dimon worked for that firm.  Def. Br. at 4.  Defendants claim that the Bank One grant was disclosed to Bank One shareholders in 2003, and that the grant was made under a "Bank One Plan" that purportedly authorized dispositions to the issuer to pay for the exercise price of stock options or to satisfy tax withholding obligations.  *See id*.  Defendants also claim that the terms of the 2004 Bank One/JPMC Agreement and Plan of Merger provided that Bank One options would be converted to JPMC options "on substantially the same terms" except for adjustment of the number of shares using a conversion ratio.  *See id*.  Finally, Defendants claim that Bank One's Board of Directors approved the terms of the Bank One grant in 2002 and

argue that the JPMC Board of Directors and shareholders approved the terms of the disposition "by approving the July 2004 merger." *See id*. at 4, 14.

As an initial matter, Defendants' claim that the Bank One Plan authorized delivery of Bank One shares to Bank One to pay for the exercise of Bank One stock options is unfounded. *See* Def. Br. at 4 (citing Bank One Plan at § 8(e) (Def. Ex. C, Dkt. 26-3)). The Bank One Plan provided that the Organization, Compensation and Nominating Committee of the Bank One Board "the "Bank One Committee"):

> ***may*** determine that Awards for which a payment is due from a Participant may be payable: (i) in U.S. dollars by personal check, bank draft or money order payable to the order of the Corporation, by money transfers or direct account debits; (ii) through the delivery or deemed delivery based on attestation to the ownership of shares of Common Stock with a Fair Market Value equal to the total payment due from the Participant; (iii) by a combination of the methods described in (i) and (ii) above; or (iv) by such other methods as the Committee may deem appropriate.

Bank One Plan at § 8(e) (Def. Ex. C, Dkt. 26-3) (emphasis added). The fact that the Bank One Committee ***may*** determine (*i.e.,* had the authority to authorize) payments for the exercise of Bank One stock options through the delivery of Bank One shares back to Bank One does not establish that the Bank One Committee actually authorized that form of payment by employees generally, let alone in connection with the March 2012 Disposition which occurred eight years after the merger. Moreover, the "may determine" language in Section 8(e) of the Bank One Plan for payments for the exercise of Bank One stock options is distinct from the language in Section 8(f) for tax withholdings (and that tax withholding language has been superseded as described *infra*). The Bank One Plan states that tax withholding payments "***will*** be made" from cash *or* through shares. Bank One Plan at § 8(f) (Def. Ex. C, Dkt. 26-3) (emphasis added). Thus, Bank One understood the difference between "may" and "will." At least in the context of the Bank One Plan, "may" is permissive and "will" is mandatory. Moreover, Defendants have come

forward with no documentation (let alone documentation appropriate for judicial notice) showing that the Bank One Committee specifically authorized payments by employees generally or by Mr. Dimon for the exercise of stock options through the delivery of shares back to the issuer (rather than, *e.g.*, only through personal check, bank draft or other approved means of delivering cash).[2]

Even if Defendants had reliably described the chain of purported advance approval events (which they did not), Defendants cite no authority for the proposition that approval of the Bank One/JPMC merger resulted in approval sufficient to establish the Rule 16b-3(e) advance approval exemption.  In addition to Defendants' failure to show that the Bank One Committee actually authorized payments for the exercise of Bank One stock options through delivery of Bank One shares back to Bank One, there are a few more issues with Defendants' portrayal of events that would render any such authority irrelevant.  Those issues can be summarized by the reality check that Mr. Dimon exercised JPMC options under the JPMC Incentive Plan – Mr. Dimon did not exercise Bank One options (which no longer existed) under the Bank One Plan (which also no longer existed).

*First*, the Incentive Plan governs the JPMC options and the March 2012 Disposition.  The Incentive Plan provides for "a single, shareholder approved plan."  Schedule 14A (Apr. 4, 2005) at 35 (Fruchter Decl. Ex. 2).  Shares subject to the Incentive Plan include:

> shares granted through assumption of, or in substitution for, outstanding awards previously granted by an employing company to individuals who become Employees as the result of a merger, consolidation, acquisition or other corporate transaction involving the employing company and the Company or shares granted to such Employees pursuant to contractual obligations with respect to such merger, consolidation, acquisition or other corporate transaction.

---

[2] At minimum, Plaintiff should be permitted to proceed to discovery on the scope of all purported advance approvals relied upon by Defendants for their motion to dismiss.

*Id.* at 31.[3]  *See also* Schedule 14A (Apr. 7, 2011) at 55 (Fruchter Decl. Ex. 3) (same).

*Second*, for any Bank One options that were converted to JPMC options, the carry-forward terms were the number of options, the expiration date and the merger-adjusted price. Any other terms and conditions, including the terms for disposition or payment, are supplied by the JPMC Incentive Plan.

*Third*, the Incentive Plan provides that the "method and form" of payment for the exercise price of JPMC options "shall be determined by the Committee from time to time," *i.e.*, by the Compensation & Management Development Committee of the JPMC Board of Directors (the "JPMC Committee") from time to time.  *See* Schedule 14A (Apr. 4, 2005) at 32 (Fruchter Decl. Ex. 2).  *See also* Schedule 14A (Apr. 7, 2011) at 56 (Fruchter Decl. Ex. 3) (same).  A determination by the JPMC Committee "from time to time" requires just that – a determination by the JPMC Committee (and, for the Rule 16b-3(e) exemption, that determination must be made in advance of the transaction).  As the JPMC Committee demonstrated with the RSU Awards concerning tax withholdings, it knows how to make determinations in advance of transactions in plain and explicit terms.  Thus, for the RSU Awards, the JPMC Committee determined – in advance – that JPMC "will retain from each distribution the number of shares of Common Stock required to satisfy applicable tax obligations."  (Def. Ex. M, Dkt. 26-13 at 5; Def. Ex. N, Dkt. 26-14 at 5).  That the form of payment for the exercise of stock options "shall be determined by the Committee from time to time" is quite distinct from the requirement that JPMC "will retain" RSU Award tax withholdings from distributions.

---

[3] The Court may consider the Schedule 14As in deciding the motion to dismiss.  *See Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 244 (S.D.N.Y. 2011).

Similarly, the form of tax withholding payments for stock options as opposed to RSUs is "at the Committee's discretion" –

> The Company shall have the right to deduct from all amounts paid to any Participant in cash (whether under this Plan or otherwise) any taxes required by law to be withheld therefrom. In the case of payments of Awards in the form of Common Stock, ***at the Committee's discretion***, the Participant may be required to pay, in such form as the Committee may specify, to the Company the amount of any taxes required to be withheld with respect to such Common Stock prior to its receipt, or, in lieu thereof, the Company shall have the right to retain the number of shares of Common Stock the Fair Market Value of which equals the amount required to be withheld.

Schedule 14A (Apr. 4, 2005) at 33-34 (Fruchter Decl. Ex. 2) (emphasis added). *See also* Schedule 14A (Apr. 7, 2011) at 58 (Fruchter Decl. Ex. 3) (same).  Defendants have not shown (and have not come forward with documents for judicial notice) that the JPMC Committee exercised its discretion to permit tax withholdings via stock.

To establish the Rule 16b-3(e) advance approval exemption, Defendants would need to show advance approval by the JPMC Committee for permission to pay for the exercise of JPMC stock options through the delivery of JPMC stock back to the Firm or for permission to make tax withholdings via stock.  By all appearances, Defendants have left no stone unturned looking for that required advance approval – and have not found it.   Instead, Defendants attempt to rely on purported approvals from 2003 and 2004 that do not amount to approvals and that are outside the Incentive Plan.  Those purported approvals were superseded by JPMC shareholder approvals of the Incentive Plan in 2005 and 2011 and they do not provide a basis for Defendants to properly invoke the Rule 16b-3(e) advance approval exemption in this case.  Defendants have provided neither specific approval for the transaction at issue in this case nor advance approval through any applicable plan.

Note 3 to Rule 16b-3 is by all accounts where this issue is easily resolved.  Note 3 states:

> The approval conditions of paragraphs (d)(1), (d)(2) and (e) of this section require the approval of each specific transaction, and are not satisfied by approval of a plan in its entirety except for the approval of a plan pursuant to which the terms and conditions of each transaction are fixed in advance, such as a formula plan. Where the terms of a subsequent transaction (such as the exercise price of an option, or the provision of an exercise or tax withholding right) are provided for in a transaction as initially approved pursuant to paragraphs (d)(1), (d)(2) or (e), such subsequent transaction shall not require further specific approval.

17 C.F.R. § 240.16b-3(e) note 3.  Note 3 clearly states that where an exercise price or tax withholding right is initially approved, subsequent approval is not necessary.  The opposite is also true.  Where an exercise price or tax withholding right is not initially approved, subsequent approval is necessary.  For example, where a cashless exercise is not provided for in the plan, subsequent specific approval is required.  The same is true for payment of tax withholdings via stock.

Indeed, this is the understanding of the leading Section 16(b) commentators.  The withholding or delivery of securities pursuant to a previously approved cashless exercise or tax withholding right are examples of subsequent transactions that do not require approval.  However, "if the withholding or delivery of securities pursuant to the right is discretionary on the part of the issuer, specific approval of the withholding or delivery transaction would be necessary (*Telephone Interpretations Manual*, No. R. 45 (July 1997))."  Peter J. Romeo & Alan L. Dye, COMPREHENSIVE SECTION 16 OUTLINE, 540, § IV(F)(6) (June 2005).

Similarly, Arnold S. Jacobs in describing Note 3 states that "when the terms of the award as approved provide for a subsequent participant-directed election [in this case, Mr. Dimon paying the exercise price or tax withholdings in stock rather than cash], that election is exempt

without further condition if effected pursuant to those terms."  Arnold S. Jacobs, SECTION 16 OF THE SECURITIES EXCHANGE ACT, 3-465, § 3.75 (July 2002).

Furthermore, the SEC 1996 Final Rules to Section 16(b) explain that "[t]he 1994 Release proposed amendments to current Rule 16b-3(f) to exempt exercise withholding rights and the surrender or withholding of issuer equity securities in satisfaction of a tax-withholding obligation."  Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release Nos. 34-37260, 35-26524, 61 Fed. Reg. 30376, 30381 (June 14, 1996).  However, those proposed amendments were "not adopted because the same transactions will be exempted pursuant to the broad scope of the new rule" – "provided that such disposition is approved in advance by the board of directors, a committee of Non-Employee Directors, or the shareholders."  *Id*.

All of the authorities are clear: sales of stock back to the issuer to pay the exercise price or to pay tax withholding amounts are exempt from Section 16(b) *if* the relevant terms are approved in advance.  Here, Mr. Dimon's March 2012 Disposition is not exempt because his sale of stock back to JPMC to pay the exercise price or for tax withholding was not approved in advance.

## II.    The March 2012 Disposition Is A "Sale" and Is Not An "Unorthodox Transaction" Under Section 16(b)

Defendants seek to avoid Section 16(b) altogether based on the "unorthodox" or "borderline" transaction doctrine announced in *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 593-94 (1973).  *See* Def. Br. at 15-17.  Under the *Kern County* rule, it is not necessary that the plaintiff prove actual abuse; the transaction must be subjected to scrutiny if there is a possibility of abuse.  *Kern Cnty*., 411 U.S. at 592.  As an initial matter, the unorthodox transaction exemption does not apply to a "garden variety" insider where the transaction is

14

voluntary.  *See At Home Corp. v. Cox Communications, Inc.*, 446 F.3d 403, 408 (2d Cir. 2006).

The exception is "extremely narrow" and was created by the Supreme Court to address the

unusual circumstance of an insider's disposition of stock in an issuer in connection with certain

corporate transactions, such as a merger, where the timing of the disposition is entirely outside of

the control of the insider and the insider was not likely to have access to inside information.  *See*

*Kern Cnty.*, 411 U.S. at 599; *Colan v. Mesa Petroleum Co.*, 951 F.2d 1512, 1523 (9th Cir. 1991)

("[t]he majority of the transactions which have been considered 'unorthodox' within the narrow

exception announced in *Kern County* involve exchanges of stock pursuant to a merger."); *Texas*

*Int'l Airlines v. National Airlines, Inc.*, 714 F.2d 533, 539 (5th Cir. 1983) (the unorthodox

transaction exception is "extremely narrow").  In *Kern County*, the Supreme Court held that an

involuntary exchange of stock by an insider pursuant to a merger constituted an unorthodox

transaction which did not serve as a vehicle for speculative abuse.  *Kern Cnty.*, 411 U.S. at 599.

"The critical fact is that the exchange took place and was required pursuant to a merger between

[the issuer] Old Kern and Tenneco. That merger was not engineered by [the insider] Occidental

but was sought by Old Kern to frustrate the attempts of Occidental to gain control of Old Kern.

[The insider] Occidental obviously did not participate in or control the negotiations or the

agreement between Old Kern and Tenneco."  *Id.*

Following *Kern County*, the Second Circuit adopted a two-part test for the application of

the unorthodox transaction defense that embodies *Kern County's* focus on the involuntariness of

the transaction and the insider's lack of access to inside information.  The two-part test requires

that: (1) the insider involuntarily participated in the relevant transaction, and (2) the insider did

not have access to inside information. *At Home*, 446 F.3d at 408.  *See also Heublein v. General*

*Cinema Corp.*, 722 F.2d 29, 31 (2d Cir. 1983); *Huppe v. WCPS Int'l Inc.*, 670 F.3d 214, 218-19 (2d Cir. 2012).

Under *At Home*, the unorthodox transaction defense clearly does not apply here. Dimon cannot satisfy the first factor – the requirement that the insider have participated involuntarily in the transactions. Defendants do not contend that Mr. Dimon's decision to exercise his stock options "approximately six weeks before the 2002 Options were scheduled to expire" was forced or automatic by virtue of a merger or other corporate transaction. *See* Def. Br. at 5. Also, Mr. Dimon's decision to use shares to pay the exercise price of the stock options and for tax withholding was voluntary. Defendants claim that the dispositions were made based on terms that were approved in advance. *See* Def. Br. at 16. However, for the March 2012 Disposition, the sale of shares back to JPMC was not approved in advance, as shown *supra*.

Dimon, who at all relevant times was an officer and director of JPMC, cannot satisfy the second factor of the *At Home* test, *i.e.*, that he did not have access to inside information concerning JPMC. Moreover, to the extent that Defendants argue for Rule 16b-3(e) because Mr. Dimon purportedly did not have an information advantage over JPMC (*see* Def. Br. at 16-17), Defendants again overlook that the disposition to issuer exemption requires advance approval – and there was no advance approval. The SEC considered the necessary requirements for an issuer-insider transaction notwithstanding a lack of information advantage and fashioned Rule 16b-3(e).

For the March 2012 Disposition, Defendants also argue that "the potential to profit ended, at the latest, when the options were exercised." *See* Def. Br. at 16 n.16 (citing, *inter alia*, *Chechele v. Sperling*, 758 F.3d 463, 470 (2d Cir. 2014)). *Chechele* is inapposite. In *Chechele*, the Second Circuit held that "[t]he exercise of a traditional derivative security (as opposed to its

16

expiration) is a 'non-event'" and that "the expiration of an option can only be matched to its own writing for section 16 purposes." *Chechele*, 758 F.3d at 469.  At issue in *Chechele* was whether the exercise or expiration of options are purchases or sales for Section 16(b) purposes.  In this case, Plaintiff does not match the July 2012 Purchases to the exercise of stock options.  Instead, Plaintiff matches the July 2012 Purchases to dispositions of JPMC stock that Mr. Dimon obtained from the exercise of the options.[4]  (Am. Compl. ¶ 13).  That distinction is significant – under the Incentive Plan, Mr. Dimon could have done whatever he wanted with the stock that he obtained from the exercise of his options, and he could have paid the exercise price or tax withholdings with cash from another source.  The possibility of speculative abuse therefore arises because Dimon may have paid for the option exercise price in JPMC stock knowing that the price of JPMC stock would decline in the near future.  The sale of stock to JPMC in the March 2012 Disposition and the July 2012 Purchases are matchable under Section 16(b).

Defendants also argue that the policing of insider-issuer transactions falls outside the purpose of Section 16(b).  *See* Def. Br. at 16-17 (citing *Roth ex rel. Beacon Power Corp. v. Perseus, L.L.C.*, 522 F.3d 242, 249 (2d Cir. 2008)).  Defendants read too much into *Beacon Power*.  In *Beacon Power*, the Second Circuit held that the SEC had the authority to promulgate rules exempting insider-issuer transactions – rules that specify advance approval or other conditions to qualify for the exemption.  *See Beacon Power*, 522 F.3d at 249.  The SEC has not promulgated – and thus no court has upheld – rules unconditionally exempting all insider-issuer transactions from Section 16(b).

---

[4] For the same reason, *Roth v. Goldman Sachs Grp., Inc.*, 740 F.3d 865, 870-71 (2d Cir. 2014) and *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 49 (2d Cir. 2012), are inapposite.  *See* Def. Br. at 16 n.16.

**III.     Plaintiff's Demand Satisfies Section 16(b)**

Defendants claim that Plaintiff "failed to make a proper demand on JPMC." Def. Br. at

17-18 (citing *Simmonds v. Credit Suisse Sec. (USA) LLC*, 638 F.3d 1072, 1091, 1093 (9th Cir.

2010) (applying Delaware law). As an initial matter, JPMC is a Delaware corporation (Am.

Compl. ¶ 7). The Ninth Circuit in *Simmonds* held that for a Delaware corporation "demand

letters must be analyzed in accordance with Delaware law, unless there is a conflict between

Delaware law and federal law that 'would frustrate specific objectives' of Section 16 and the

Exchange Act." *Simmonds*, 638 F.3d at 1089 (citing *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90,

98 (1991)). Thus, Delaware law applies to Plaintiff's demand in this case only to the extent that

applying Delaware law does not frustrate the specific purposes of Section 16(b). That purpose is

to "prevent[ ] the unfair use of information which may have been obtained by [a] beneficial

owner, director, or officer by reason of his relationship to the issuer. . . ." 15 U.S.C. § 78p(b)

(2014).

Notably, unlike a traditional derivative suit that is the typical subject of analysis of

demand sufficiency under Delaware law, Section 16(b) confers a primary cause of action on both

the issuer and shareholders (although with a demand requirement that grants the issuer a first

right of refusal). "[I]f the issuer shall fail or refuse to bring such suit within sixty days after

request or shall fail diligently to prosecute the same thereafter." 15 USCS § 78p (2014).

Plaintiff gave JPMC every opportunity to recover the short-swing profits alleged in the

Complaint, and JPMC refused.

In *Simmonds*, the Ninth Circuit quoted the Court of Chancery as noting that demand

letters must be sufficiently specific to "enable the board to perform its duty to make a good faith

investigation of claims of alleged wrongdoing[ ] and ... to rectify the misconduct" at issue in a

18

subsequent lawsuit.  *Simmonds*, 638 F.3d at 1090 (quoting *Yaw v. Talley*, No. Civ-A-12882,

1994 Del. Ch. LEXIS 35, 23 (Del. Ch. Mar. 2, 1994)).  Plaintiff made his claims and intentions

clear – and JPMC demonstrated that it understood those intentions.  On February 13, 2014 (3.50

months before the initial complaint was filed on June 2, 2014), Plaintiff apprised Mr. Dimon and

Mr. Anthony Horan (JPMC Corporate Secretary and a member of the bar in the state of New

York) of the July 2012 Purchases and their match under Section 16(b) against the January 2013

Disposition.  (Def. Ex. O, Dkt. 26-15.)  Plaintiff stated that the disposition was not exempt, asked

that profits be returned to the shareholders, and stated that he would proceed with a private right

of action if JPMC did not "force the shareholder recovery."  *Id.*

On February 21, 2014 (3.25 months before the initial complaint), Plaintiff further

apprised Dimon and Horan concerning the March 2012 Disposition, stated that the dispositions

were "not exempt under Rule 16b-3," estimated the amount of short-swing profits, and asked that

the profits be returned to the JPMC shareholders.  (Def. Ex. P, Dkt. 26-16.)

On March 4, 2014, Mr. Horan sent a two-page letter to Plaintiff on JPMC letterhead

(inexplicably, bearing a "Privileged and Confidential" legend), recapping the viewpoints

expressed by Plaintiff concerning the dispositions and the July 2012 Purchases and setting forth

JPMC's alternative viewpoint about the validity of the claimed exemptions.  (Def. Ex. Q, Dkt.

26-17.)  On March 20, 2014, Mr. Horan reiterated JPMC's purported determination that the

dispositions were exempt and stated that Plaintiff was "of course free to pursue legal action as

you see fit" – and then threatened Plaintiff with Rule 11 sanctions.[5]  (Def. Ex. S, Dkt. 26-19.)

Plaintiff and JPMC had a common understanding of the identity of the alleged

wrongdoer, the identity of the transactions at issue (including an estimate of short-swing profits),

---

[5] Communications after the initial complaint was filed on June 2, 2014 have no bearing on the demand sufficiency analysis.

and the remedy that Plaintiff sought under Section 16(b).  The fact that JPMC declined to take

*any* action to recover the short-swing profits because it purported to have a different opinion

about the validity of the claimed exemptions leaves unchanged the fact that JPMC was on notice

of the claims that Plaintiff intended to bring if JPMC failed to act.  That notice satisfied Section

16(b), in which Congress called upon shareholders like Plaintiff to recover short-swing profits

for the issuer where the issuer declines its first right of refusal.  In the Amended Complaint,

Plaintiff challenged under Section 16(b) the exact transactions that were the subject of his

demand.  To require more of Plaintiff in this case would conflict with the purpose of Section

16(b) in deputizing lay shareholders to enforce the statute.

## CONCLUSION

For the reasons set forth herein, Defendants' motion to dismiss the claim for

disgorgement for the March 2012 Disposition and the July 2012 Purchases should be denied.

Dated: November 24, 2014.

      /s/Jack G. Fruchter
      Jack G. Fruchter
      Mark S. Hamill
      ABRAHAM, FRUCHTER &
      TWERSKY LLP
      One Pennsylvania Plaza, Suite 2805
      New York, New York 10119
      Tel.: (212) 279-5050
      Fax: (212) 279-3655

      **Attorneys for Plaintiff John Olagues**

20

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2014, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing documents or paper to be mailed via United States Postal Service to any non-CM/ECF participants indicated on the manual Notice List.

I certify under the laws of the United States of America that the foregoing is true and correct.

Executed on November 24, 2014.

/s/Mark S. Hamill
Mark S. Hamill